**Robert SUNENBLICK d/b/a Uptown Records, Plaintiff,**

v.

**Andre HARRELL, Andre Harrell, Inc., MCA, Inc. and MCA Records, Inc., Defendants.**

No. 91 Civ. 6606 (BN).

United States District Court, S.D. New York.

Aug. 10, 1995.

Skadden, Arps, Slate, Meagher & Flom (Kenneth A. Plevan, John B. Kennedy, Miriam L. Siroky, of counsel), New York City, for plaintiff.

Pryor, Cashman, Sherman & Flynn (Stephen F. Huff, Andrew H. Bart, Dierdre Oren Byrne, Narciso F. Saavedra, of counsel), New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge: *

### INTRODUCTION

Dr. Robert Sunenblick ("Sunenblick"), plaintiff, is a medical doctor who operates an independent jazz record company called Uptown Records and has sold his records since 1979 under the unregistered label "Uptown Records". Andre Harrell ("Harrell") is a rap artist who has sold many records and compact discs featuring such well known artists as Jodeci, Father MC and Mary J. Blige, also under an unregistered trademark of "Uptown Records". Sunenblick, contending that defendants' use of the label "Uptown Records" is a trademark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), seeks (1) a permanent injunction enjoining defendants from using the trademark UPTOWN or any trademark confusingly similar thereto as a record label or in connection with their recording business; and (2) damages in the form of a royalty on defendants' sales under their "Uptown Records" label.**

Since Sunenblick's trademark "Uptown Records" is phonetically identical to that of defendants, for ease of reference the court will hereafter refer to Sunenblick's trademark as UPTOWN RECORDS and will refer to defendants' mark as *MCA/UPTOWN RECORDS.*

The court has jurisdiction of this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338. The following constitute the court's findings of fact and conclusions of law in compliance with Fed.R.Civ.P. Rule 52(a).

### THE RECORD

The plaintiff offered six witnesses at trial. Sunenblick himself testified concerning the selection of his label, and the development of his company generally, and also produced his east coast distributor, Jay Baney, the president of Twinbrook Records. Baney testified concerning misdirected inquiries he received at Twinbrook from potential buyers of defendants' products. Carol Nazzaro testified concerning her efforts to obtain a copy of one of Sunenblick's recordings, and the erroneous statements of store clerks that the recording was unavailable at their stores. Sunenblick also introduced three expert witnesses: Professor Tricia Rose, an authority on hip-hop music and culture; Dan Morgenstern, an expert on jazz music; and Weston Anson, chairman of Trademark & Licensing Associates, who suggested a comparable royalty rate be used to calculate damages.

Defendants offered two fact witnesses and three expert witnesses. Harrell testified concerning his selection of the *MCA/UPTOWN RECORDS* label and the rapid growth of his enterprise. Michael Ostroff, Vice President of Business and Legal Affairs at MCA, testified concerning the business arrangement between Harrell and MCA, as well as MCA's lack of knowledge of the existence of Sunenblick's trademark prior to 1991. Steve Harman, Regional Manager of the very large record chain, Tower Records, testified concerning the marketing and sale of musical recordings and methods by which customers search for a given recording. Gerald Barad, Vice President of Brockum Merchandisers, testified relative to the opportunity of licensing trademarks in the area of musical record labels. Finally, defendants offered Joe Fields, owner of Muse Records, a nationally prominent independent jazz label. Fields testified that Sunenblick's label was

---

* Bernard Newman, Senior Judge of the United States Court of International Trade sitting as a United States District Judge by designation. The instant case was transferred to the writer via regular channels by the Honorable Loretta A. Preska, United States District Judge.

** The court wishes to express its appreciation to counsel for their professionalism. Their conduct of the trial and the submissions received by the court in this case were of the highest quality.

particularly obscure in the marketplace, both from the point of view of general sales and among jazz enthusiasts.

The parties further offered the deposition testimony of several other individuals, as well as approximately 400 exhibits.

## FINDINGS OF FACT

*Sunenblick*

Sunenblick is, as noted, a medical doctor. Although he has no formal musical training, he has had a lifelong passion for jazz music and possesses a considerable personal collection of jazz recordings, numbering between 100,000 and 125,000. Since 1978, Sunenblick has operated an independent company to record and release jazz music of relatively unknown or "forgotten" artists. He has operated his company while still maintaining a full-time medical practice.

Although Sunenblick's first recording was of rather primitive quality and was never released, his three subsequent recordings were released in 1980 under the UPTOWN RECORDS label. Each recording was selected as a "best pick" by *Billboard* magazine. (PX 30B).

According to Sunenblick, he first selected "Uptown Jazz" as the name of his new record label, but shortly thereafter switched to UPTOWN RECORDS, the name he ultimately used and has continued to use since 1979. Sunenblick adopted a mark featuring the word "Uptown" because he considered the term to evoke the stylish image of African–American jazz culture in Harlem, New York as it was known in the 1930's and 1940's.

In April 1981 Sunenblick formed a joint venture with another medical doctor, Mark Feldman, to produce and distribute jazz recordings. While the joint venture was known as Uptown Productions, the records were released under the UPTOWN RECORDS label. Within five years the relationship between Sunenblick and Feldman

soured. In mid–1986 Sunenblick and Feldman discontinued their joint venture, reaching a final settlement in November 1986. In conformance with the settlement, Feldman retained part of the joint venture's catalogue, while Sunenblick retained the remainder and exclusive rights to the UPTOWN RECORDS trademark as well as the use of the accompanying logo.

From the inception of his UPTOWN RECORDS label in 1979 to the present, Sunenblick has produced and released a total of 35 recordings under the mark UPTOWN RECORDS, selling 80,000 units in the form of vinyl records, cassette tapes and compact discs, originally through the mails. (PX 95). Sunenblick testified that gross revenues have exceeded $400,000, although the record further establishes that the business has incurred an overall net loss of $134,644, and has only made a modest net profit in six of the fifteen years in question. Although Sunenblick's records have been sold in some large retail outlets, such as Tower Records, J & R Music World and HMV, as well as smaller outlets, it is only in three years out of fifteen (1983, 1988 and 1989) that Sunenblick has sold more than 5,000 records overall in a given year. Only three of his recordings (chief among them the Maria Muldaur *Transblucency* recording, UP27.25) sold in excess of 5,000 units.[1]

It appears that the poor commercial performance of Sunenblick's label is the result of a virtually nonexistent effort at advertising the releases in his catalogue. Although there is evidence that he has printed fliers and arranged advertisements in jazz publications, particularly for the recording of Maria Muldaur in *Transblucency*, examination of financial statements from an eleven year period commencing in 1982 and running through 1993 reveals that Sunenblick spent a mere $13,500 in advertising and promotion for the period. (DX AR through AZ). In point of fact, from 1989 through 1993, Sunenblick expended no money at all on advertis-

---

1. *Transblucency's* comparative success may be explained largely in light of the fact that Maria Muldaur was known as a pop singer, and not a "forgotten" jazz artist resurrected from obscurity by Sunenblick. The court further observes that Sunenblick's own expert witness, Morgenstern, admitted under cross-examination and in his deposition that a record selling fewer than 5,000 copies for an extended period of time could not be regarded as commercially successful. (R. 482, lines 7 through 22).

ing. Moreover, Sunenblick's catalogue has not become visible in record stores, due to ineffective distribution and the infrequency with which he has released new product. (R. 732, 915–16). Defendants further established that Sunenblick's label is not listed in the *Schwann* or *Penguin* catalogues, which provide comprehensive listings of jazz recordings and are often available for reference by purchasers at record stores. (R. 928).

The court further notes that for a period of eighteen months following Sunenblick's split with Dr. Feldman, he did not release any new product. Since 1987, he has only recorded and released three newly recorded sessions. In the same period, the remainder of Sunenblick's releases were comprised of pre-existing recordings and the licensing of other performances. (DX AR; R. at 758, 761).

The record does show, however, that Sunenblick has "policed" his mark: on two occasions, through legal counsel he successfully prevented other groups that had come to his attention from marketing music under the label "Uptown" or "Uptown Records". (R. 97–99).

Recognizing as we must the well-nigh invisible impact of Sunenblick's UPTOWN RECORDS label in the market, the court does observe that some performances appearing on Sunenblick's recordings have received favorable reviews (PX 11, 30, 30A, 30C, 96 & 98). The record further establishes that three artists recorded under Sunenblick's label were nominated for Grammy awards.[2] Additionally, Sunenblick produced a number of monthly play lists from various radio stations that have played one or more of his releases. (PX 31).[3]

Neither Sunenblick's mark nor that of defendants is federally registered, although Sunenblick did file a New York state registration for the UPTOWN RECORDS mark in February 1981.[4] Neither Sunenblick nor defendants conducted a trademark search prior to adopting their respective marks.

*MCA, Inc. and MCA Records, Inc.*

Defendant MCA, Inc. ("MCA") is a major entertainment conglomerate engaged in a variety of enterprises such as movie and television production, entertainment-related merchandising and licensing, and music publishing. MCA is a Delaware Corporation with its principal place of business in Universal City, California. Defendant MCA Records, Inc. ("MCA Records") is part of MCA's Music Entertainment Group and is engaged in the manufacture, marketing and distribution of compact discs, records and tapes. MCA Records is a California corporation with its principal place of business in Universal City, California. In the fall of 1990, MCA was acquired by Matsushita for approximately $6.13 billion. At the time of trial it had been announced that a controlling interest was recently purchased by Seagrams for over $5 billion. (PX 100).

*Andre Harrell and Andre Harrell, Inc.*

Harrell is an individual residing in New York, New York. Harrell is the President

---

**2.** Sunenblick places considerable emphasis on the Grammy nominations. However, the record establishes that Grammy nominations of the period cannot be relied upon as probative evidence of public awareness of his product or his label. Fields testified that during the relevant period, nominations were made by a committee of jazz critics, whereas now they are made on the basis of popularity. (R. 929).

**3.** The court has reviewed the play lists in Exhibit 31 and has counted approximately 70 instances where radio stations in Canada and the United States have played a Sunenblick release between 1985 and 1989. Although Sunenblick testified that the exhibit only accounted for a portion of the play lists received by him, the court finds that this evidence suggests two conclusions that may be reached. First, Sunenblick's recordings are played on radio stations comparatively infrequently. The court credits the testimony of Fields in this regard. Second, of the instances adduced by Sunenblick, the court observes that approximately one quarter of such instances were the *Transblucency* recording made by Maria Muldaur, and appeared in the early spring of 1986. Another title, this one by Pepper Adams called the *Adams Effect*, accounted for an additional quarter. Assorted titles by several other artists comprised the remaining half of appearances on the monthly play lists.

**4.** The New York state trademark registration for UPTOWN RECORDS and the logo are to be "used in connection with long playing microgroove records and jackets." (PX 1, 1A, 1B). Sunenblick renewed his state registration in 1991. *Id.*

and founder of Uptown Enterprises. From the age of sixteen, Harrell was a talented rap artist and performer, first as a member of a group called "Dr. Jekyll and Mr. Hyde".[5] After graduating in 1983 from Lehman College in New York City, Harrell worked for approximately one year as an account executive at two New York radio stations. In 1984 Harrell became Vice President of Rush Productions, an artist management company founded by one Russell Simmons, another rap artist, where he was responsible for developing various rap artists. In 1985, Simmons founded another company, Def Jam Records, where Harrell also managed and directed rap performances. (R. 850–58). Plainly, Harrell was a veritable *Wunderkind,* whose energy and focus would soon lead to commercial success.

In 1986 Harrell left Rush Productions and Def Jam to start his own company, Uptown Enterprises, which was founded to develop rap and "R & B" (rhythm and blues) artists. Uptown Enterprises does business as Andre Harrell, Inc., a New York corporation. According to Harrell, he selected his own mark because:

> A: Well, the sound that I was trying to bring across and the attitude was something that I found up in Harlem. It was kind of like—kind of like an inner city life style that had like an edge to it and a cool to it, and had a style to it, so it wasn't just about music, it was about reflecting a life style, a new life style that was going on in the '80's from the rap generation.

(R. 859–60). As previously noted, neither party conducted a trademark search at the time they adopted their respective labels.[6] However, Harrell testified that in selecting his label he was interested in finding a "fresh name" to reflect the new rap life style, and that he was familiar with the names of labels in the "R & B world" at the time. (R. 860). The court is fully satisfied that Harrell, in good faith, selected his mark and was completely unaware of another mark named UPTOWN RECORDS, namely Sunenblick's.

In 1986, MCA and Harrell entered into a business arrangement whereby MCA would finance, distribute and market rap and R & B recordings produced by Harrell. Subsequent to the publication of a sound recording, *Uptown's Kickin' It,* which was released in 1986 and contained performances by Heavy D, among others, Harrell arranged to have a mark designed which contained the image of a cat with large sneakers positioned next to the manuscripted word "Uptown". (R. 858, 862). This mark appeared on later releases.

Harrell's music under the *MCA/UPTOWN RECORDS* label has consistently been a major sales success. The court received evidence of approximately 27 gold and platinum records sold by defendants between 1986 and 1994.[7] (R. at 864–866). Harrell's recordings have included well-known artists such as Jodeci, Guy, Father MC, Heavy D and the Boyz, and Mary J. Blige.

---

5. The court accepts Professor Rose's explanation of the nature of Harrell's music and understands it to be a variety of hip-hop that includes elements of R & B (rhythm & blues). "Hip-hop" refers to a multi-faceted form of art that derives its substance from rap music, break-dancing, and graffiti. The court understands rap to be a musical form, developed in African–American urban neighborhoods (at least in its inception) that emphasizes "rapped" words, usually vocalized at a steady volume and rhythm, and often rhymed. These sounds are recorded with distinctive rhythmic, drum and bass beats.

6. Sunenblick places considerable emphasis upon the fact that neither Harrell nor MCA conducted trademark searches prior to using the "Uptown" designation on their products. He raises the fact that only one attorney at MCA specializes on trademark law, as well as the lack of a policy at MCA of requiring a trademark search for every trademark employed by the company. Although his counsel did direct such searches subsequent to Harrell's adoption of the mark, in 1987 and 1989, (PX 36, 38), which did uncover Sunenblick's "Uptown Records" name, Harrell was unaware of those searches or of the results. Plaintiff further emphasizes that, although many record stores were listed in the report under United States Class 36, his mark would necessarily be included in the same list, as do those of all record labels, such as MCA. The evidence suggests that, if Harrell's counsel had recognized Sunenblick's trade name as another record label, Harrell was not alerted.

7. A gold record is one that has sold in excess of 500,000 copies. A platinum record is one that has sold in excess of 1,000,000 copies.

*Sunenblick's Discovery of Defendants' Mark*

From the time when Harrell first released music under his UPTOWN RECORDS label until 1991, Harrell's products and those of Sunenblick were sold simultaneously without either party being aware of the existence of the other.[8] However, in the fall of 1990, Sunenblick contacted Bruce Resnikoff, Senior Vice President of MCA Records, seeking to locate a specific recording of two jazz musicians, Bill Harris and Jack Nimitz. Sunenblick had learned that the recording might be in the back catalogue of ABC Paramount Records, which is owned by MCA. Sunenblick intended to acquire the rights to the recording for inclusion among other such performances on a release of previously recorded music.

Subsequently, the recording was located and MCA Records, through Resnikoff, agreed to provide Sunenblick with a license to use the recording in exchange for the sum of $1,000. On September 26, 1990, Resnikoff sent Sunenblick contracts for execution, which contracts were between MCA and "Uptown Records". (PX 9, 9A).

On November 27, 1990 Sunenblick wrote again to Resnikoff, seeking to change certain terms of the proposed contract, *viz.*, to give himself the exclusive rather than the nonexclusive rights to release the *Nimitz & Harris* title, and for a period of three rather than two years. (PX 9B). Resnikoff replied in the affirmative by letter dated November 28, 1990. (PX 9C). On January 3, 1991 Resnikoff wrote to Sunenblick, noting that he had not yet received executed copies of the contract. (PX 9D). Sunenblick wrote again for certain details on January 15, 1991. (PX 9E). However, before the agreement could

be concluded, Resnikoff wrote Sunenblick on January 23, 1991, in part, as follows:

I have become aware of a problem that must be resolved before we can finalize the proposed agreement. For your information, there is already in existence a record label called "Uptown Records" which happens to be distributed by MCA. Obviously, we could not have this record released under your "Uptown" label. Moreover, the use of the Uptown name may constitute an infringement unless there is some legal basis for your use of which I am not aware.

(PX 10). Sunenblick responded by letter dated January 29, 1991, notifying MCA that he had used his mark since 1978, and that it had been registered in New York in 1981. (PX 12). MCA then informed Sunenblick that all inquiries should be forwarded to Andre Harrell. (PX 16). Sunenblick's counsel made demands upon defendants that they cease and desist from any further use of the "Uptown" designation. (PX 15, 16, 17, 22). Defendants declined to comply, and this action followed.

## DISCUSSION

### I

 Inasmuch as Dr. Sunenblick's trademark is not federally registered, he presses a claim for trademark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which protects unregistered trademarks by proscribing false designations of origin in interstate commerce.[9] Fundamentally, to prevail on a claim of trademark infringement under section 43(a) of the Lanham Act, a plaintiff is required as

---

8. The record is not clear as to when Harrell first made use of the mark UPTOWN RECORDS, as such. According to Sunenblick, it was not until the middle of 1988 that such a mark appeared. However, the record does reflect that the logo with the cat appearing next to the word "Uptown" did appear on Harrell's early recordings. Sunenblick testified that he objected to the use of the word "Uptown" by any person other than himself in connection with records. In any case, it is clear that the two labels co-existed in the market place in apparent ignorance of each other for at least two years, and possibly longer.

9. Section 43(a) provides, in relevant part, as follows:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

a threshold matter to prove that the mark is protectable. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Then, if it is established that the mark is eligible for trademark protection, the plaintiff will prevail if there is a likelihood that consumers will be misled or confused as to the source of the goods in question. *See Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

## II

The paradigm under which unregistered trademarks are evaluated for purposes of trademark protection was established in this Circuit by Judge Friendly's 1976 decision in *Abercrombie & Fitch, supra*, which identified four shifting levels of trademark protection. Starting with the least protected marks, *Abercrombie & Fitch* identifies marks that are: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary. 537 F.2d at 9. Generic marks are ineligible for trademark protection. *Id.* at 9–10. Descriptive marks are those which directly convey an idea of the ingredients, attributes, quality or characteristics of the goods. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir.1990); *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 212 (2d Cir.1985). Descriptive marks are entitled to protection under the trademark laws only if it is first established that such marks have acquired secondary meaning, i.e., that despite describing the nature of the goods in question, such marks have come to be associated by the purchasing public over time with a single, albeit anonymous, source. *See Armstrong Paint & Varnish Works v. Nu–Enamel Corp.*, 305 U.S. 315, 335–36, 59 S.Ct. 191, 201–02, 83 L.Ed. 195 (1938); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2d Cir.1987) (citing *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 (2d Cir.1987)). On the opposite end of the spectrum lie the third and fourth varieties of trademarks, *viz.*, those that are classified as either suggestive or as fanciful or arbitrary. These latter two varieties are "inherently distinctive", and require no showing of secondary meaning to invoke trademark protection. *See Nikon, Inc. v. Ikon Corp.*, 803 F.Supp. 910, 915–16 (S.D.N.Y.1992), *aff'd*, 987 F.2d 91 (2d Cir.1993); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257 (2d Cir.1987). A suggestive mark is one that "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie & Fitch*, 537 F.2d at 11. Fanciful marks use words that are unfamiliar in language and are coined for the purpose of trademark identification; arbitrary marks employ terms which, albeit linguistically familiar, do not describe or suggest any attribute of the goods or services sold. 1 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 11.2–4 (2d ed. 1984) (hereafter "McCarthy").

It is in the broad area between generic marks and those which are fanciful or arbitrary that the instant case is fought. Defendants contend that UPTOWN RECORDS is a descriptive mark, and is devoid of secondary meaning. Defendants accordingly point to Sunenblick's testimony, in which he stated that he selected his label because he associated the word "Uptown" with jazz, and the jazz scene of Harlem in the 1930's and 1940's in particular.[10]

Sunenblick urges that the UPTOWN RECORDS mark is not descriptive of sound recordings or jazz music, but is suggestive of stylish African–American urban culture. Continuing, Sunenblick argues that the very testimony upon which defendants rely points up the suggestive nature of the mark, and refers in addition to the testimony of Harrell, who himself testified that he selected his own mark because it reflects an inner city, black lifestyle. Sunenblick further highlights the recordings in his catalogue, several of which were performed and recorded by jazz artists outside New York City, arguing that, "if Uptown means Harlem, this is hardly 'descriptive' of Dr. Sunenblick's catalogue." (Letter of Kenneth A. Plevan, Esq., in reply

10. There are many types of jazz, e.g., Dixieland New Orleans, swing, bebop, etc. (R. 442–43).

to Defendant's Post–Trial Memorandum.) The court agrees with Sunenblick.

It is significant that both Harrell and Sunenblick selected the term "Uptown" because it signified African–American culture of the inner city, although the two men undoubtedly had different experiences of what that culture meant. On this point, perhaps, Professor Rose's testimony presented something of value: conceptually, the word "Uptown" captures more than any one form of jazz or even jazz generally. Rather, although "Uptown" may have originally had a more direct association with the jazz scene of the 1930's and 1940's, it has since evolved into a term embracing a "hip", "cool", or if you will, electric, urban black culture. The court finds that an ordinary purchaser examining Dr. Sunenblick's products would not, upon examining his trademark (if indeed that purchaser were even to pay any attention whatsoever to the mark) be led immediately to the conclusion that the music recorded therein was "straight ahead jazz" or even jazz at all. Nor would the ordinary purchaser of Harrell's music be led immediately to the conclusion that *his* music described a particular form of music. In each case, some degree of imagination, perhaps assisted by consideration of the product itself, would be required for such purchasers to invest the respective marks with their intended mental association.

Since the court finds the trademark UPTOWN RECORDS is suggestive, and therefore inherently distinctive, it is entitled to trademark protection without proof of secondary meaning.

### III

Having thus established that Sunenblick's mark is entitled to protection, it remains for the court to determine whether consumers are likely to be confused by defendants' use of their own *MCA/UPTOWN RECORDS* trademark. Sunenblick must here prove "that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed, simply confused as to the source of the goods in question." *Mushroom Makers, supra,* 580 F.2d at 47.

Before proceeding to discuss the likelihood of consumer confusion, the court notes that the current matter is unlike the ordinary case in which a senior user, having generated considerable public awareness and recognition around its own trademark, complains that consumers will be led to believe that, as a result of a junior user's confusingly similar mark or trade dress, the senior user is the source of the junior user's goods. The variety of confusion thus described, also known as "forward confusion", represents the classical case where the junior user is said to trade on the good will built by the plaintiff in its own mark. Here, however, Sunenblick claims that defendants' use of the *MCA/UPTOWN RECORDS* trademark is likely to result in "reverse confusion", i.e., the phenomenon in which the junior user's advertising so greatly overshadows that of the senior user that consumers come to the mistaken conclusion that the junior user is in fact the source of the *senior user's* goods. 2 McCarthy, *supra,* at § 23.1(E).

This Circuit has held that proof of a likelihood of reverse confusion supports a claim for infringement under the Lanham Act. *See Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 490–91 (2d Cir.1988) ("[w]ere reverse confusion not a sufficient basis to obtain Lanham Act protection, a larger company could, with impunity, infringe the senior mark of a smaller one"). The essence of reverse confusion was further described in *Ameritech, Inc. v. American Information Technologies, Corp.* as follows:

> [T]he junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

811 F.2d 960, 964 (6th Cir.1987). Indeed, the consequences of reverse confusion may be that consumers will erroneously come to believe that the senior user is in fact infringing the trademark of the junior user, and thereby decline to purchase goods under the senior user's mark. *See, e.g., Big O Tire Deal-*

ers v. Goodyear Tire & Rubber Co., 408 F.Supp. 1219 (D.Colo.1976), *modified*, 561 F.2d 1365 (10th Cir.1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). *See also, PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F.Supp. 394 (S.D.N.Y.1989) (misimpression that plaintiff is the infringer can injure reputation and goodwill in its own mark).

## IV

In this Circuit, the likelihood of confusion is evaluated in light of the test established by Judge Friendly in his landmark decision in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Under *Polaroid*, the court considers the following non-exclusive factors:

> the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495. Each *Polaroid* factor must be considered in the context of the other factors, and no single factor may be dispositive of the likelihood of confusion. *Nikon, supra*, 803 F.Supp. at 915. The court here indicates its conclusions as to each of the *Polaroid* factors *seriatim:*

### 1. Strength of the Trademark.

■ This first factor presents a new issue for the court to consider: in a reverse confusion case, exactly which trademark is the relevant one to examine when considering the strength of the mark? For the reasons that follow, the court holds that it is logical to examine the strength of the junior user's mark. Before addressing the comparative strength of defendants' mark, however, the court pronounces its findings concerning Sunenblick's mark.

### A.

The strength of the trademark "refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold

under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). The degree of the mark's distinctiveness is determined, in part, by its placement in the *Abercrombie & Fitch* spectrum discussed in Part II, *supra. See Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983). Hence, Sunenblick argues that, inasmuch as his mark is suggestive and thus inherently distinctive, it should be considered strong, thereby resolving this *Polaroid* factor in his favor.

■ However, the classification of a mark as suggestive is not necessarily dispositive on the issue of its strength, which must finally be determined in reference to its commercial context. *See Centaur Communications*, 830 F.2d at 1225–26. Put another way, a mark may be conceptually strong and yet commercially weak if the mark lacks the requisite "origin-indicating" quality in the eyes of consumers. *McGregor–Doniger*, 599 F.2d at 1131. *See also Playboy Enters. Inc. v. Chuckleberry Publishing Co.*, 486 F.Supp. 414, 420 (S.D.N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982). Consequently, although secondary meaning need not be proved in the first instance to entitle a trademark to protection under the Lanham Act, evidence of secondary meaning is always relevant to assessing the strength of the mark under the *Polaroid* test. *See McGregor–Doniger*, 599 F.2d at 1132.

In *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208 (2d Cir.1985), the Second Circuit identified six factors to guide courts in evaluating the existence of secondary meaning:

(1) the senior user's advertising and promotional expenses

(2) consumer studies linking the name to the source

(3) the senior user's sales success

(4) third party uses and attempts to plagiarize the mark

(5) length and exclusivity of the mark's use

(6) unsolicited media coverage of the products at issue.

*Id.* at 217.

 As the court has already discussed, Sunenblick's advertising expenditures during the relevant period have been relatively minuscule, and his releases have not generally been commercially successful.[11] More, no survey evidence has been adduced by Sunenblick to demonstrate that consumers have come to identify the trademark UPTOWN RECORDS with a particular source, namely Sunenblick. Although his products have been played on some radio stations, and have received favorable reviews in certain publications, defendants correctly point out that releases under Sunenblick's label have been few and far between, thereby leading the court to question whether such exposure as the UPTOWN RECORDS label has received could generate any strength in the mark.

Defendants also refer to instances in which third parties made use of the word "Uptown" as a trademark.[12] The court rejects defendants' argument in this regard. First, the evidence does not establish that the term "Uptown" is being used as a record label by such third parties. Second, to the extent that nonparties have made use of "Uptown" as a trademark, defendants have not adduced proof that such third party uses have actually undercut Sunenblick's mark. *See Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173–74 (2d Cir.1976) (third-party trademarks significant not by virtue of their mere existence but upon proof of their usage and customer awareness of such marks) (citations omitted).

Defendants' expert, Joe Fields, described Sunenblick's business as a hobby; the court would consider that a slight overstatement. However, the court concurs in Fields' overall assessment that, with infrequent releases, anemic advertising and poor sales, Sunenblick's catalogue is virtually invisible in the jazz marketplace, and in the market for music generally.

**B.**

Having determined that Sunenblick's mark is a very weak one, the court now turns to Sunenblick's contention that, even if his mark were found to be weak, he would still be entitled to prevail under this *Polaroid* factor because the doctrine of reverse confusion properly should focus, not on the senior user's mark, but that of the intervening junior user. Indeed, Sunenblick goes so far as to assert that, in reverse confusion cases, the strength of the senior user's mark is irrelevant because the harm complained of typically flows from consumer recognition of a much stronger *junior* user's mark. In this vein, Sunenblick relies upon precedents outside this Circuit. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466 (3d Cir. 1994); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993), *on remand,* 1993 WL 204092, 1993 U.S.Dist. LEXIS 7893 (N.D.Ill. June 8, 1993), *aff'd in part, vacated and remanded in part,* 34 F.3d 1340 (7th Cir. 1994).

Defendants strenuously argue that the approach adopted by the Seventh Circuit in *Sands, Taylor,* and hinted at by the Third Circuit in *Fisons Horticulture,* is inapplicable in this Circuit. Defendants highlight several precedents of the Second Circuit, particularly following *Sands, Taylor,* in which the court continued to apply the traditional *Polaroid* test, and examined the likelihood of consumer confusion in light of the strength of the senior user's mark. Defendants thus press the argument that this court is bound by the decisional law of the Circuit in which it sits. *See Consolidated Rail Corp. v. Ted Sobiech Farms,* 717 F.Supp. 1062, 1063 (S.D.N.Y.1989); *United States v. DeFabritus,*

11. As already noted, Sunenblick's own expert testified that a record selling fewer than 5,000 copies for an extended period of time could not be considered commercially successful—a circumstance that describes all but three of Sunenblick's releases. (R. 482).

12. Defendants identify: an "Uptown Productions" mark registered in Pennsylvania in 1988; "Uptown Video", registered in Arizona in 1984; and "Uptown" registered in Massachusetts in 1984, as well as several common law uses of "Uptown" in connection with music and other entertainment goods and services. Defendant's Post–Trial Brief at 33.

605 F.Supp. 1538, 1544 (S.D.N.Y.1985). *See also* 1B *Moore's Federal Practice,* ¶ 0.402[1] at I–10 to I–12, I–14 (2d ed. 1993).

The court is not persuaded, however, that it would be improper to acknowledge the force of precedent outside this Circuit, inasmuch as the doctrine of reverse confusion is still in an early stage of development. It should be recalled that, in applying the *Polaroid* factors to allegations of reverse confusion, this Circuit has employed a test that was originally designed to evaluate cases of forward confusion. Indeed, prior to *Banff,* reported cases of reverse confusion were quite rare in any circuit, and virtually nonexistent at the time Judge Friendly authored *Polaroid.* Moreover, examination of the case law relied upon by defendant suggests that the issue raised today by Sunenblick has not yet been confronted by the Second Circuit and is a question of first impression in this court.

Turning, therefore, to the issue at hand, this court agrees with the observations made in *Fisons Horticulture* and *Sands, Taylor.* It is the essence of reverse confusion that the senior user's mark will be comparatively weaker—and quite probably much weaker indeed—than that of the powerful junior user. It is in such cases, where the visibility and strength of the junior user's mark have occupied the field, that the consumer is likely to consider the senior user's product as either emanating from the junior user or infringing upon the junior user's trademark rights. Consequently, the court should properly examine the strength of the junior user's mark.

Under the rule just described, it is to be noted that Harrell's *MCA/UPTOWN RECORDS* mark is stronger than that of Sunenblick's mark. Certainly, evidence of sales of defendants' products in the millions of dollars, along with the evidence of MCA's aggressive promotion of Harrell's products, makes it likely that purchasers of hip-hop music, at least, have been exposed to the *MCA/UPTOWN RECORDS* mark to a greater degree than jazz consumers have been exposed to Sunenblick's mark. Weighed against this observation, of course, is the fact that no consumer surveys have been put into

evidence to establish that the *MCA/UPTOWN RECORDS* mark, in absolute numbers, is known by an appreciable percentage of even hip-hop purchasers. On balance, this factor weighs slightly in favor of Sunenblick.

*2. Similarity of the Marks.*

*3. Proximity of the Products.*

The ultimate question when considering the degree of similarity between two marks is whether that similarity is likely to generate confusion among potential customers. *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993); *McGregor–Doniger,* 599 F.2d at 1133. Since the similarity between trademarks has different implications depending upon whether or not the products are competitive, it is proper to consider the issue of similarity in conjunction with the third factor, the proximity of the products. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 77 (2d Cir.1988); *Centaur Communications,* 830 F.2d at 1226.

The word marks UPTOWN RECORDS and *UPTOWN RECORDS* would be, if spoken as part of the transaction, phonetically identical (ignoring "MCA", which upon visual inspection of the CD appears near but plainly apart from defendants' "Uptown" designation). However, the manner in which the parties' logos are displayed on the parties' respective products immediately reveals certain dissimilarities. A side by side comparison of the logos is provided in the Appendix found at the end of this opinion.

Sunenblick's logo consists of a black outline of what appears to be the skyline of midtown New York City with the word "Uptown" written across the skyline in a contrasting white script on an upward slant. The word is underlined three times, and the logo appears within a double circle. The mark UPTOWN RECORDS also appears on the rear cover of Sunenblick's recordings.

Defendants' logo is a cartoon of a black cat standing up in an anthropomorphic pose, wearing a T–shirt, a gold medallion, and sneakers of an exaggerated size. The cat appears casually leaning with its left elbow upon the word "Uptown", which is written on a slant, in a dark color, and in a script that is

clearly distinguishable from that of the word "Uptown" in Sunenblick's mark. On at least some of defendants' releases, the word "Records" appears to the right of "Uptown", although in an ordinary, sans serif typeface. (PX 88, 89).

Plainly, the logos are easy to distinguish, a fact conceded by Sunenblick. (R. 194–95). The court finds that the marks do not create the same overall impression, and are not likely to promote confusion. *See Western Publishing Co., Inc. v. Rose Art Industries, Inc.*, 910 F.2d 57, 61 (2d Cir.1990).

█ Considering the proximity of the products, Sunenblick maintains that, at least with regard to the word mark "Uptown Records", the parties both use that mark on musical products, which are often sold in the same retail outlets, in the same cities and in the same format. Thus, Sunenblick concludes that the existence of two phonetically identical marks on such products must result in confusion.

Defendants, however, argue that the respective products do not compete for the same consumers. Sunenblick's products are addressed to a somewhat esoteric market, *viz.*, purchasers interested in lost or forgotten jazz artists, in the "straight ahead jazz" category, whereas defendants sell rap recordings. The record favors defendants in this regard. Although the products are sold in the same channels of trade, they are not sold side-by-side; rather, they are featured in different sections of the stores in which they are sold, according to genre and not by label name. (R. 687–88; 690–91). Hence, absent any evidence that consumers of one will be potential consumers of the other, it is most likely that the consumer entering a record store with the intention of purchasing one of Dr. Sunenblick's products would not even see defendants' products, much less the trademarks appearing thereon.

Sunenblick proposes, however, that the markets for jazz and hip-hop are not entirely separate. In this regard, Sunenblick highlights two facts in support of such proposition. First, he relies upon the testimony of Rose and Morgenstern concerning a trend toward "fusion" among both jazz and hip-hop musicians to sample elements of each other's musical styles in their own compositions. (R. 444–45). Second, Sunenblick points to a survey performed by the National Jazz Service Organization and sponsored by the National Endowment for the Arts, which reports a "cross-over" among listeners of both soul/rhythm and blues on the one hand and jazz on the other. (PX 69 at 56). The court rejects Sunenblick's argument.

First, the trend toward fusion within the respective categories of music does not establish that consumers of one genre of music have become consumers of the other. Fusion notwithstanding, the products at issue here are marketed differently and are still sold in separate sections of record stores. Moreover, Sunenblick's recordings are "straight ahead jazz", not fusion, and concern artists who made their name years before fusion even made its appearance on the jazz scene.

Second, turning to the survey, the court has already determined that, while the report was properly referred to during Morgenstern's testimony, it was nevertheless not admissible into evidence on hearsay grounds. FRE 703. Additionally, insofar as the report formed the basis for Morgenstern's expert opinion, it does not support a finding of consumer confusion. Although the survey does speak of a possible "cross-over", it suggests that respondents used the terms "jazz" and "rhythm and blues" interchangeably, betraying a confusion as to their meaning, and not necessarily signifying an interest in both genres. Moreover, and significantly, the survey supports no conclusions whatsoever concerning the impact on consumer behavior of such a supposed "cross-over" on the part of jazz listeners. Finally, the court recalls that, although this report identifies a potential jazz audience in the United States of approximately 50 million, the jazz purchasing market consists of a small fraction of the listening audience. Accordingly, the report can lend no support to Sunenblick's contention that his jazz products are commercially proximate to defendants' substantial hip-hop recordings.

Thus, these *Polaroid* factors favor defendants.

#### 4. Bridging the Gap.

■ This factor examines the likelihood of confusion in light of the probability that the senior user will enter the junior user's market in the future. Here, the record establishes beyond peradventure of doubt that the likelihood of Sunenblick's entering the fusion market—much less the pure hip-hop market—is remote, at best. When asked at trial if he intended to produce hip-hop, Sunenblick answered that he would prefer to keep the option open, although it appears that he definitively rejected any such plans in his deposition. (R. 225–27). While Sunenblick suggested he might consider production of a jazz/hip-hop combination such as one recent recording under the Blue Note label, that is a far cry from joining the market for hip-hop recordings as a competitor with MCA. It is evident that the motivating force behind Sunenblick's company was his dream to produce one particular variety of jazz music, and to record artists who otherwise might never have been heard. Consequently, the court finds that Sunenblick has no present plans to enter the hip-hop market, and is unlikely to do so in the future. This factor, then, weighs strongly against a finding of confusion, and favors defendants.

#### 5. Actual Confusion.

■ It is well established that, in a claim under the Lanham Act, "actual confusion need not be shown ... since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986). Nevertheless, evidence of actual confusion, where shown, is highly probative of the likelihood of confusion. *See Grotrian, Helfferich, Schulz Th. Steinweg Nachf. v. Steinway & Sons,* 365 F.Supp. 707, 715–16 (S.D.N.Y.1973), *modified,* 523 F.2d 1331 (2d Cir.1975) ("[a]lthough evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion.") Proof of actual confusion may take the form of direct evidence, such as anecdotal evidence by consumers, or market research surveys. *See*

*Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 140 (2d Cir.1991).

■ Sunenblick offers no survey evidence and relies entirely upon several instances of misdirected inquiries:

- Sunenblick's warehouser, Charles Nessa, who carries Sunenblick's products but not defendants' label, received a telephone call from a production company trying to book an artist on defendants' Uptown label.
- Plaintiff's distributor, Jay Baney, received numerous inquiries from buyers seeking defendants' recordings.
- Another distributor, Rick Ballard, received an order from Tower Records for defendants' product.
- Sunenblick himself found his label name did not appear in the Tower Records computer, and that although more than ten of his recordings were on sale in the store, only one was listed in the computer—mixed in with defendants' Uptown products.
- A customer, Carol Nazzaro, was told by two store clerks at Tower Records that the chain did not carry Sunenblick's "An Uptown Christmas" CD. Tower was, in fact, stocked with the recording at the time.
- Danny Bessine, a store owner in Iowa, was referred to MCA and defendants' Uptown in his search for two of his customers. Both MCA and Uptown told him there was no such record.
- In a recent jazz magazine, in which Dr. Sunenblick's recent release was advertised, one of Dr. Sunenblick's new recordings was not listed in the "new recording" sections, but a Mary J. Blige release, put out by defendants and containing hip-hop music, was listed.

■ In assessing the probative value of the above described instances of confusion, the court considers it appropriate first to comment on the type of protection the Lanham Act provides. Evidence of actual confusion must be examined in light of whether the defendant's mark is likely to confuse an appreciable number of *ordinary prudent*

*purchasers* as to the source of the product in question. *Windsor, Inc. v. Intravco Travel Centers, Inc.*, 799 F.Supp. 1513, 1521 (S.D.N.Y.1992) (citing *Western Pub. Co. v. Rose Art Industries, Inc.*, 910 F.2d 57, 59 (2d Cir.1990)); 2 McCarthy at § 23.27. In most cases, this will mean the ultimate consumer, not a retailer or wholesale buyer. Thus, McCarthy states:

> The protection that is extended is to the buying public, the casual, average purchaser, and not just to the wholesale buyer or the long-established customer. That is, where a product is sold both to consumers and to wholesalers and retailers, the issue of likelihood of confusion will usually revolve around the consumer, for his is the lowest level of the "reasonably prudent buyer." Professional buyers are expected to be more discriminating and knowledgeable in making purchases and they may not be confused.

*Id.* at § 23.29, pp. 133–34. *See also* 3A Rudolf Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 20.09 (4th ed. 1983) (hereafter "Callman"). Considering the market for CD's, and the trial record in particular, the court is convinced that the relevant buyer class is the ultimate consumer.

Turning to the examples of actual confusion proffered by Sunenblick, the telephone call to Ballard was from a buyer at Tower Records, and reflects confusion, such as it is, on the part of a relative expert, not an ordinary customer. Ballard ignored the single misplaced order and the caller did not pursue it, much less purchase any recordings. Similarly, the court discounts the value of the misdirected telephone call to Nessa, which was initiated by a production company attempting to book an artist on the MCA/Uptown label. And although Bessine's inquiries to MCA on behalf of two prospective purchasers of plaintiff's records were, on their face, an example of reverse confusion, it is stressed that Bessine was not deceived and did not end his search with MCA. That neither Bessine nor his customers were finally deceived as to a purchasing decision further buttresses the fact that the initial confu-

sion of a retailer does not support a finding of actual confusion.

As to the misprinted magazine listing and the erroneous programming of the Muze machine at Tower Records, neither instance directly involves a purchasing decision. It is to be repeated that the relevant confusion to be avoided is that which affects purchasing decisions, and not confusion generally. *See Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582–83 (2d Cir.1991) and authorities there cited.

Sunenblick himself testified that he approached a clerk at Tower Records and asked for "some Uptown Records", only to be misdirected to defendants' products. The court discusses this matter more fully, *infra*, but notes here that the incident thus described cannot be taken as evidence of actual reverse confusion. First, the inquiry was made not by an ordinary purchaser, but by the owner of the label itself. Second, no purchasing decision was involved, and no sales were likely to be diverted as the result of the sales clerk's error. Finally, Sunenblick's request was so far removed from the daily realities of consumer purchasing that it cannot be used as a fair point of comparison.

Continuing, Sunenblick's east coast distributor, Jay Baney, testified that over a period of approximately one year, retailers seeking MCA's products would occasionally telephone or fax inquiries to his company under the mistaken impression that he was the distributor for *defendants'* products. However, as the Second Circuit stated in *Lang*, misdirected telephone calls such as those described by Baney are not probative of reverse confusion where the consumers erroneously believe the *senior user* is the source of the *junior user's* product. 949 F.2d at 583. Evidence that would support a finding of reverse confusion would be instances of prospective purchasers of Sunenblick's products who thought they emanated from MCA—a fact not proved by evidence here. *See id.*

The final instance of actual confusion cited by Sunenblick is similarly of no avail. Although Nazzaro is a consumer of Sunenblick's recordings, her testimony establishes that the confusion she experienced was in the

form of misinformed store clerks. While the court can sympathize with the inconvenience she suffered, we are constrained to agree with defendants that her account does not support a finding of actual reverse confusion. First, Nazarro knew precisely what she wanted and at no time was confused by the *MCA/UPTOWN RECORDS* mark. Second, and importantly, her testimony did not establish that she ever believed that defendants were the source of Sunenblick's product. It should also be observed that Nazarro's situation was unique, in that the title of the recording itself contained the word "Uptown".

It might be suggested that, if a retailer or a sales clerk is confused by a similar record label, an ordinary customer must be. However, a retailer, unlike the customer, is necessarily focused upon the label in making his own record transactions, whereas the customer is more likely to be concerned about the artist and composition, a factor the court will discuss more fully *infra*. Considering further the relative sophistication of the retailer and wholesaler—demonstrated by the fact that no such person was ultimately deceived in this case—the court finds that the few instances identified by Sunenblick plainly are not probative of actual confusion on the part of the relevant class of purchasers.

In sum, there is no evidence in the record that during the entire period when the parties were concurrently selling recordings under an "Uptown" designation a customer ever made a purchasing decision under the mistaken impression that MCA or Andre Harrell was the source of Sunenblick's product. Nor did any customer decline to purchase Sunenblick's products under the erroneous belief that he was an infringer of MCA's label. Nor, finally, has any identity that Sunenblick sought to build into his label among jazz purchasers been adversely impacted by the existence of defendants' label. Defendants compare the instant case to others in which concurrent use of similar trademarks has gone unnoticed by consumers for a period of years, thereby undermining the likelihood of consumer confusion. Defendant's Post–Trial Brief at 18–19. *See, e.g., W.W.W. Pharmaceutical Co., Inc. v. Gillette*

*Co.*, 808 F.Supp. 1013 (S.D.N.Y.1992), *aff'd,* 984 F.2d 567 (2d Cir.1993); *Plus Products, supra,* 722 F.2d at 1006. The court agrees. In fact, the record establishes that Sunenblick and MCA were themselves unaware of each other's simultaneous use of the word "Uptown" for the same period. Indeed, Sunenblick and MCA discovered each other's marks entirely by accident, exchanging letters for several weeks before even noticing the coincidence.

The short of the matter is that Sunenblick has proved no instances of actual reverse confusion on the part of the relevant class of purchasers, and no surveys exist to show that such actual confusion is probable in the marketplace. Hence, this factor decisively favors defendants.

### 6. *Defendants' Good Faith in Adopting Their Mark.*

■ The inquiry into a defendant's intent is resolved by determining whether the alleged infringer has selected a similar or identical mark with knowledge of the senior user's mark. Thus, "evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded." *Warner Bros. v. American Broadcasting Co.*, 720 F.2d 231, 247 (2d Cir.1983); *Mobil Oil Corp. v. Pegasus Petroleum,* 818 F.2d at 258 (same). The record definitively establishes that defendants are entitled to prevail on this factor. It is uncontroverted that Harrell was unaware of Dr. Sunenblick's mark at the time he selected his own. The court is fully satisfied that Harrell arrived at his *MCA/UPTOWN RECORDS* mark in much the same way as Sunenblick chose his own mark: after careful, creative reflection upon the culture that his music would represent.

Although defendants here are innocent users of their mark, Sunenblick argues that the court should look to defendants' failure to conduct a trademark search before using the *MCA/UPTOWN RECORDS* mark as evidence of bad faith, thus tilting this factor in his favor. In essence, Sunenblick puts forward a "David against Goliath" argument, focusing upon MCA's battery of attorneys and faulting the entertainment giant for fail-

ing to make a thorough trademark search. For this proposition, Sunenblick relies upon *Fisons Horticulture, supra.*

To be sure, it would have been more prudent to conduct a careful trademark search prior to adopting the *MCA/UPTOWN RECORDS* mark. The court further acknowledges that the issue of whether a given defendant conducted a trademark search has been recognized in this Circuit as a relevant inquiry. *See Lang, supra,* 949 F.2d at 583 (2d Cir.1991) (in reverse confusion case request for trademark search reflects good faith); *Hasbro, supra,* 858 F.2d at 78 (affirming magistrate's finding that despite narrow trademark search defendant's belief that it was senior user supported finding of good faith). The court is unaware of any reported decision in this Circuit, however, where the failure to conduct such a search was held, on its own, to be evidence of *bad* faith, thereby making a likelihood of confusion greater.[13] In fact, it has been held that a junior user's knowledge of another's mark does not necessarily compel a finding of bad faith. *See, e.g., W.W.W. Pharmaceutical,* 984 F.2d at 575; *Lang,* 949 F.2d at 583–84. *Accord, Sweats Fashions v. Pannill Knitting Co.,* 833 F.2d 1560, 1565 (Fed.Cir.1987) (even where trademark search conducted bad faith requires more than mere knowledge of prior similar mark).

It is critical to recall that, under the *Polaroid* test, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986). It was for that reason, therefore, in *Mobil Oil* that the Second Circuit, inferring from the defendant's copying of Mobil's flying Pegasus mark an intent to benefit from Mobil's good will, held that the defendant's wrongful intent was probative evidence of a likelihood that consumers would, in fact, be confused. 818 F.2d at 259. Put another way, when examining the intent prong under *Polaroid,* intentional copying of a mark is presumably *calculated* to deceive,

and is therefore deemed *likely* to deceive, thereby justifying an injunction. *See* 3A Callman, § 20.50 ("[s]ince he is likely to be correct in his estimate that the mark is deceptive, all doubts on the issue of confusing similarity can be fairly resolved against the newcomer").

Ultimately, the court considers that defendants' failure to conduct a trademark search prior to using the *MCA/UPTOWN RECORDS* mark does not reflect bad faith, but resulted instead from Harrell's belief that he was aware of all the record labels in the hip-hop market and that none of them carried an "Uptown" designation. The court cannot say that the intent of Harrell or MCA reflected an awareness that consumers would likely be confused by the *MCA/UPTOWN RECORDS* mark, much less an intent to achieve such a result. Hence, this factor does not assist Sunenblick.

### 7. *Quality of the Products.*

 The court in *Hasbro* recognized that the quality prong of *Polaroid* has been applied in different ways, depending upon the facts of a given case:

> One view is that an inferior quality product produced by the junior user injures the senior user's reputation insofar as consumers might think that the source of the inferior product is the senior user. Another view is that a junior user's product of equal quality to a senior user's product injures the senior user by the increased tendency of similar quality products to promote consumer confusion.

858 F.2d at 78 (citations omitted). Bearing the *Hasbro* court's statements in mind, the court finds that Sunenblick's products and those of defendants are of high quality. However, the evidence does not show that their comparably high quality promotes consumer confusion.

Nonetheless, Sunenblick urges that the content of defendants' music, and of one recording in particular, might be offensive to purchasers of his products, thereby causing injury to his products under the consumer's

---

**13.** Defendants further point out that this court has previously explicitly held the contrary in *Oxford Industries Inc. v. JBJ Fabric Inc.,* 1988

WL 9959, 1993 U.S.Dist. LEXIS 953 (S.D.N.Y. 1988). *See also, Karmikel Corp. v. May Dep't*

mistaken belief that his products emanated from the same source as Harrell's recordings. (PX 74–76). The court finds Sunenblick's argument in this respect unpersuasive. Although Nazzaro testified that she would find the contents of some of defendants' music objectionable, there is no evidence that she, or any other consumer of Sunenblick's music, was ever aware of the existence, much less the content of defendants' recordings. Nor is jazz free from its own variety of sexual suggestiveness. (R. 471–72). Finally, as Sunenblick himself points out, it is common knowledge that some large record companies, such as Sony, release many genres of music under the same label, thereby permitting the inference that such companies have not suffered an injury to sales for one variety of music as a consequence of their sales in other areas, such as hip-hop. Plaintiff's Post–Trial Memorandum at 27–28. In sum, the evidence does not lead to the conclusion that ordinary prudent purchasers of Sunenblick's music, even if made aware of defendants' products, would decline to purchase jazz recordings under Sunenblick's label due to their disapproval of defendants' music. This factor, therefore, favors defendants.

### 8. *Sophistication of the Purchasers.*

[24] In this case, the issue of the customers' sophistication must be read to some extent in conjunction with the court's observations concerning the relative strength of the two marks. Generally speaking, the record suggests that customers of musical recordings are necessarily discriminating as between jazz and hip-hop, and are not likely to suffer confusion in the same manner as customers who might purchase less easily differentiated goods bearing confusingly similar trademarks. Recalling once more that the relevant inquiry under *Polaroid* is whether a given factor sheds light on the likelihood of confusion, the court agrees with defendants that buyers of musical recordings are relatively sophisticated consumers whose purchasing decisions are driven by a recognition of and search for a particular artist or com-

position, and whose awareness of the record label—if such awareness even exists at the time of purchase—is at best a peripheral concern compared to the contents of the recording.

The diminished importance of the record label becomes all the more conspicuous in light of Sunenblick's own testimony, in which he described his expedition to Tower Records in New York and asked the sales clerk where he could find some "Uptown Records." (R. 153). The sales clerk obliged Sunenblick and misdirected him to some of defendants' products. Sunenblick described this transaction in an attempt to demonstrate an instance of actual confusion, described more fully *supra.* Nevertheless, his account is enlightening for an entirely different reason, when one considers how bizarre the request was. The notion that customers typically enter a record store with the request, "Please show me the MCA records", or "Where can one find your *Deutsche Grammophon* CD's" is simply counter-intuitive. The court credits the testimony of Harman that such a request, even if it were made by a customer, would inevitably be followed up by a request from the sales clerk to the customer to identify the variety of music, the name of the performer or the title of the piece before the conversation could proceed. (R. 689–91).[14]

The court acknowledges that the analysis thus described, taken to its logical extreme, might prove too much. Defendants actually contend that record labels are irrelevant to the purchasing decision. The unavoidable conclusion would be that such marks can never receive protection under the trademark law. The court is not willing to go quite that far. Nevertheless, the court does accept that the role of the trademark in the purchase of musical recordings is generally subordinate in a meaningful way to the purchaser's search for the artist and the composition. Compact discs are not radial tires. The short of the matter, therefore, is: where, as here, neither trademark has been shown to be particularly strong; where neither trademark figures prominently on the prod-

*Stores Co., Inc.,* 658 F.Supp. 1361 (S.D.N.Y. 1987).

14. Not surprisingly, Harman testified that no customer ever asked him for a product based upon the record label. (R. 689).

ucts in question; where the goods are not proximate in the marketplace; and finally, where the marks are as distinguishable as those of Sunenblick and defendants, the possibility that the ordinary consumer's attention will be focused on the trademark is correspondingly slight, thereby rendering the probability of confusion that much lower. *See, e.g., Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 583 (S.D.N.Y.1972) ("movie goers are relatively sophisticated purchasers whose decision to patronize a particular place of business is based substantially upon the feature offered rather than the name of a particular theater").

\* \* \* \* \* \*

█ In view of the *Polaroid* factors, the court concludes there is no likelihood that consumers will be confused as to the source of Sunenblick's products as a result of defendants' trademark.

## CONCLUSION

Both parties passionately invoked the American dream before this court. It is plain that Sunenblick represents the best of that dream. He had a vision. He undertook the risks, investing time, energy and money in order to make the vision a reality.

And so did Andre Harrell. He is the very archetype of an American success story. In consideration of the facts, the court cannot say that Harrell's success poses any likelihood of injury to Sunenblick in the marketplace.

Accordingly, it is ORDERED, ADJUDGED AND DECREED that the complaint be, and it hereby is, DISMISSED. Each side will bear its own costs.

**IT IS SO ORDERED.**

# APPENDIX