**HARLEM WIZARDS ENTERTAINMENT BASKETBALL, INC., Plaintiff,**

v.

**NBA PROPERTIES, INC.; National Basketball Association; and, Capital Bullets Basketball Club, Inc., Defendants.**

**Civ. No. 96–3001 (WHW).**

United States District Court, D. New Jersey.

Jan. 27, 1997.

total newsstand sales of its special editions. *See* Brief of *Amici curiae,* at 5.

Robert J. Berman, Michael R. Friscia, Peter E. Nussbaum, Friscia & Nussbaum, East Rutherford, NJ, for Plaintiff.

Robert J. Del Tufo, Kenneth A. Plevan, Skadden, Arps, Slate, Meagher & Flom, Newark, NJ, Jeffrey A. Mishkin, Kathryn L. Barrett, Sara B. Goldstein, NBA Properties, Inc., New York City, for Defendants.

*AMENDED OPINION*

WALLS, District Judge.

Plaintiff, Harlem Wizards Entertainment Basketball, Inc. ("Harlem Wizards") is a theatrical basketball organization that performs "show basketball" in the tradition established by the world famous Harlem Globetrotters. Defendant, the Capital Bullets Basketball Club, commonly known as the "Washington Bullets," is a member team of the National Basketball Association ("NBA"), the world's preeminent professional basketball league, also a named defendant in this action. The third defendant is NBA Properties, Inc. ("NBA Properties"), the entity which holds the licensing rights of the names of NBA member teams.

On February 22, 1996, the Washington Bullets publicly announced that beginning the 1997–1998 NBA season, the team would formally change its name to the "Washington Wizards." Soon after, Harlem Wizards filed this lawsuit against the Washington Bullets and the other mentioned defendants, alleging that the proposed name change infringed its trademark in violation of Section 43 of the Lanham Act, The New Jersey Trademark Act, N.J.S.A. 56:4–1 and common law. Plaintiff seeks a permanent injunction enjoining these defendants from using the trademark WIZARDS and various damage awards.[1]

■ At the outset, plaintiff acknowledges that the issues raised in this action do not conform to the traditional pattern of trademark infringement. Plaintiff, for example, does not allege that if the Washington Bullets team becomes the Washington Wizards a significant number of basketball fans will be confused into believing that the Washington team is actually the Harlem Wizards. Nor does plaintiff assert that it has already lost income as a result of the name change or that the Washington Bullets have, as of yet, earned any profits from their adoption and use of the mark WIZARDS. Instead, plaintiff frames this action as a classic case of "reverse confusion," a theory of trademark infringement recently recognized by this circuit. *See Fisons Horticulture, Inc. v. Vigoro*

*Industries, Inc.*, 30 F.3d 466, 31 U.S.P.Q.2d 1592 (3d Cir.1994). Reverse confusion occurs when a larger, more powerful junior user infringes on the trademark of a smaller, less powerful senior user causing confusion as to the source of the senior user's goods and services. *Id.* Because the junior user saturates the market with promotion of the mark as its own, the senior user loses its trademark value and its ability to expand into new markets because consumers assume that the senior user's goods or services are those of the junior user or that the senior user is the infringing party. *Fisons*, 30 F.3d at 474–75, 31 U.S.P.Q.2d at 1598 (citing *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987)). This opinion analyzes the trademark infringement claims pressed by plaintiff in light of the reverse confusion doctrine, other applicable law and the evidence.

***THE RECORD***

At the bench trial, plaintiff offered seven fact witnesses and one expert witness: Todd Davis, president of the Harlem Wizards since 1980 and son of the team's founder; Sam Worthen, assistant coach of the Harlem Wizards and a former NBA player; Dwion Brown, Jay Griffin, Claude Henderson, and Sean Tartt, all current members of the Harlem Wizards; Stephanie Ebron, executive director of the Perry School Community Center in Washington, D.C., who hired Plaintiff to perform at a fundraising event in Washington earlier this year; and Dr. Michael Rappeport, who conducted a consumer survey on behalf of plaintiff and gave expert testimony.

Defendants presented six fact witnesses and one expert witness: Stephen Board, manager of interactive events for the NBA; Paula Hanson, vice president of team services for the NBA; Susan O'Malley, president of the Washington Bullets' franchise; George Mitchell, owner of the Harlem Rockets, a show basketball team; Glen Morrill, assistant director of customer service for Washington Sports and Entertainment, the organization which owns the Washington

---

1. The Court bifurcated plaintiffs damages claims; at this bench trial, the Court only considered whether plaintiff is entitled to a permanent injunction.

Bullets and the Washington Capitals hockey team; Wesley Unseld, general manager of the Washington Bullets; and an expert witness, Dr. Jacob Jacoby, who conducted a consumer survey.

The following are the relevant facts of this controversy. In this case, because such evidence is uncontroverted, its credibility and that of the witnesses from whom it was adduced is absent. However, the parties vigorously challenge the legal significance of this evidence, which the Court reviews together with its findings in the *Discussion* section of this opinion.

From its founding in 1962, Harlem Wizards has promoted itself as a show basketball team. In its advertisements and promotional materials, Harlem Wizards frequently compares itself to the better known Harlem Globetrotters, which developed and popularized the show basketball genre. For example, Harlem Wizards bills itself as the "Avis of comedy basketball," the Harlem Globetrotters clearly being Hertz, and also as the "grassroots version of the Harlem Globetrotters." Although Harlem Wizards' biggest market is in the Northeast, the team has traveled throughout the United States and, to some extent, internationally. For the past three years, Harlem Wizards has actually consisted of two teams: one team which actively tours the country and a local team which performs mostly in the New York City metropolitan area.

Harlem Wizards generally performs at high schools, colleges, summer camps, and charitable events. Plaintiff has no home arena where it regularly plays before fans who can regularly attend its games nor does it participate in any formalized basketball league competitions. Unlike a traditional professional competitive sports team, plaintiff does not advertise its services directly to consumers through the media, but instead promotes itself through direct mail solicitation to its typical customers—schools, camps and charities, at trade shows for performance acts, and in "amusement business" trade magazines such as the "Cavalcade of Acts and Attractions." Schools and other organizations can purchase plaintiff's services for a flat fee of $3,500.00 and travel expenses,

although plaintiff will sometimes accept a smaller fee in exchange for a portion of game proceeds.

In a typical Harlem Wizards "game," plaintiff plays against a "team" selected by the organization which purchased the team's services. Opposing team members are not professional athletes but ordinary citizens such as plumbers, teachers, police officers, coaches, politicians and students. A resulting game combines competitive basketball, trick basketball and comedic basketball entertainment. During the first and third quarters of the game, the Harlem Wizards mostly play competitive basketball against their opponents, moderating its level of competitiveness to the opposing team's athletic prowess. During the second and fourth quarters, the team players engage in comedic antics such as passing the ball between their legs, throwing water at their opponents, rolling down their opponents' socks and befuddling the other team's members by handing them the ball and then quickly snatching it away. In addition to these game performances, Harlem Wizards makes frequent paid appearances at fairs, festivals, parties, school assembly programs, pep rallies, and bar mitzvahs. Over the years, the Harlem Wizards team has on at least two occasions played during the half-time intermissions of NBA basketball games.

In connection with its games and appearances, plaintiff sells a variety of merchandise bearing the team's name. There, spectators can purchase t-shirts, sweatshirts, caps, basketballs, posters, banners, and pictures as souvenirs but none of the merchandise is available in retail stores. Plaintiff has used both the marks HARLEM WIZARDS and WIZARDS as its logo on merchandise and team uniforms. During the mid–1980s, the team used WIZARDS on its uniforms and it plans to use WIZARDS as its mark during its 1996–1997 season. Plaintiff does not have specific color scheme or a design that it uses continuously as part of its logo.

At trial, plaintiff sought to emphasize that show basketball is only part of Harlem Wizards' repertoire. The record, however, clearly demonstrates that over the last thirty-five years, the team has played few competitive

basketball games without any comedic entertainment, and almost always during international tours. According to Todd Davis, the team has not played a competitive game on American soil since the late 1970s or early 1980s. Plaintiff's witness Claude Henderson, who first joined the Harlem Wizards in 1967, testified that the team played its last fully competitive game in 1979.

Washington Bullets is a NBA member team owned and operated by Capital Bullets Basketball Club. Founded in 1961, the franchise originated in Chicago, where it was first known as the Chicago Packers and later, the Chicago Zephyrs. It then moved to Baltimore, Maryland in 1963 and became known as the Baltimore Bullets. In 1973, the team moved to Washington, D.C. and changed its name to the Capital Bullets. The following year, the team adopted the name the Washington Bullets.

The NBA, which celebrates its fiftieth anniversary this year, is made up of twenty-nine member teams that play annually against each other from November until June. The league is divided into two conferences, Eastern and Western, and four divisions, Atlantic, Midwest, Central and Pacific. The NBA has strict rules governing the games as well as player conduct on and off the court. As an NBA franchise, the Bullets play eighty-two games—forty-one at "home" and forty-one "away"—against other NBA member teams from November until mid-April. Games are divided into four twelve minute quarters. Following regular season play, sixteen teams compete in the NBA championship playoffs.

Fans can regularly attend Washington Bullets' games or watch them on television. NBA basketball is promoted directly to its fans through television advertisements, regular television programming such as "Inside Stuff" and "Inside NBA," and other media sports coverage. The NBA also has a series of grants, licenses to manufacturers to produce various products bearing the NBA logo and those of its twenty-nine member teams. Specific labeling and tagging is used to identify all NBA and NBA team products; the NBA logo of a ball-dribbling player appears on all of its products. NBA merchandise is widely available for sale in retail outlets throughout the United States.

For the past few years, Abe Pollin, owner of the Washington Bullets, had been considering changing the name of the franchise out of concern that the term "Bullets" had a negative connotation. In January 1995, the Washington Bullets first informed the NBA that it was considering changing the team name, logo and uniform beginning the 1997–1998 season. In August 1995, Susan O'Malley, president of the Washington Bullets, sent the NBA's Paula Hanson a letter which listed eight possible new names for the team, including the name WIZARDS. Hanson forwarded the letter to Kathryn Barrett, the NBA's in-house trademark counsel, and requested that she arrange for a preliminary trademark search to determine if for any reason any of the names listed were not be available for use. A few days later Hanson forwarded the preliminary search results to O'Malley. The use of WIZARDS was not interdicted.

Along with its name change, the Washington Bullets unveiled a new anti-violence initiative that concentrated on Washington, D.C. junior high and middle schools. To publicize the name change and anti-violence initiative, the Washington Bullets staged a contest in conjunction with Boston Market Restaurants, "The Washington Post," NBC4, the local NBC affiliate and other media sponsors, inviting fans to take part in the name-change process. The contest, called "Boston Market Renames the Bullets," occurred in two phases. From November 1, 1995 until December 15, 1995, fans could suggest new names for the team by completing entry ballots at Boston Market restaurants. Then, from early February until February 22, 1996, fans could vote on one of five names selected from the earlier submissions selected by a "Blue Ribbon Panel" by calling a 900 telephone number. The contest culminated with a live network announcement of the winning name by Abe Pollin on February 22, 1996.

By January 1996, the Blue Ribbon Panel had selected five names out of approximately 3,000 to be included during the second phase of the contest: Washington Dragons, Washington Express, Washington Sea Dogs,

Washington Stallions, and Washington Wizards. O'Malley forwarded these five names to Hanson. Hanson then sent these names to Barrett who arranged for full trademark searches to be conducted on every name except the Washington Dragons, a mark for which the NBA had previously filed a trademark application in anticipation that another NBA team might want to adopt it. Full trademark applications were filed for Washington Sea Dogs, Washington Stallions, Washington Express, and Washington Wizards. The firm of Thompson and Thompson conducted the trademark searches on January 29, 1996 and mailed them to the NBA on February 2, 1996. The trademark search for the mark WIZARDS retrieved 575 potential references and sixty-three were included for the NBA's review. Harlem Wizards was among those entities listed and plaintiff's services were described as professional sports. None of the names submitted by defendants was discarded as the result of the trademark searches.

After the Washington Bullets announced that its new name would be the Washington Wizards on February 22, 1996, the NBA in-house creative services designed several different potential logos for the team. As of yet, no final decision has been made regarding a final logo but defendants claim that the final logo will be unique, and like all other NBA logos, have a distinct color scheme. On February 8 and February 29, 1996, Plaintiff filed trademark applications first for HARLEM WIZARDS and then WIZARDS.

Plaintiff elicited testimony that sought to prove that defendants adopted the name Washington Wizards in bad faith. For example, Stephen Board, Manager of Interactive Events for the NBA, hired Sean Tartt, a Harlem Wizards' player, to participate in a slam dunk exhibition in San Antonio, Texas earlier this year. Tartt testified that he told Board that he played for the Harlem Wizards. Board acknowledged that he spoke with Todd Davis who identified himself as Tartt's coach at the Harlem Wizards and who asked him whether he wanted to hire any other Harlem Wizards' players. Plaintiff also introduced testimony that Davis had contacted Glenn Morrill in 1993 and 1994 to see if he would be interested in hiring Harlem Wizards to perform at NBA half-time programs and elicited testimony from Wesley Unseld, General Manager of the Washington Bullets, that he had first heard of the Harlem Wizards during the late 1960s or early 1970s.

*Evidence of Actual Confusion and Likelihood of Confusion*

1. *Individual Testimony*

At trial, plaintiff offered testimony by two current Harlem Wizards' players regarding incidents that purportedly showed the existence of actual consumer confusion between the Harlem Wizards and Washington Wizards. Dwion Brown testified that while he was in Baltimore, Maryland and Washington, D.C. strangers approached him because they thought that the Harlem Wizards' shirt that he was wearing was actually a Washington Wizards' shirt. Claude Henderson testified regarding several incidents of actual confusion. First, he testified that in April 1996, four people told him that they thought he was a member of the Washington Wizards when he played at the Perry School Community Service Center fundraiser at Gonzaga High School in Washington, D.C. In July 1996, when he made an appearance at a children's camp with Terry Harris, a Harlem Wizards' player who happens to be seven feet and five inches tall, several young campers remarked to him that they did not realize that the Washington Bullets had two of the tallest players in the NBA. Henderson also testified that when he played at another community center several youngsters asked him whether the Wizards would be playing in the NBA in the coming year. Stephanie Ebron, Executive Director of the Perry School Community Service Center, an organization that hired plaintiff to perform at a fundraising event on April 29, 1996 in Washington, D.C., testified that more than twenty people who attended or expressed interest in attending the fundraiser had thought that the Washington Bullets were playing and not the Harlem Wizards. Before plaintiff performed, Ebron told Todd Davis about the confusion and he brought along questionnaires that were distributed at the game in order to document incidents of actual confusion.

### 2. *Survey Evidence*

Both parties commissioned consumer surveys and presented their results at trial. Plaintiff offered results from two related surveys conducted by Dr. Michael Rappeport of RL Associates in May 1996 to support its assertion that the Washington Bullets' name change would result in the likelihood of confusion between the Harlem Wizards and the Washington Wizards. Dr. Rappeport conducted one survey in Northern New Jersey and the other in the Washington, D.C. area. Combined, the 309 respondents who participated in both studies were aged eighteen or older and had either attended a basketball event or watched a televised basketball event at least twice in the past year. The two surveys were a shirt study and a name study. The shirt study involved showing respondents a series of four shirts: (1) a red Chicago Bulls' number 23 shirt, (2) a white "Champion" shirt, (3) a blue New York Knicks' shirt and (4) a Harlem Wizards' shirt. Upon showing a respondent each shirt, the interviewer asked the respondent whether she or he had ever seen or heard of the team before. If the respondent answered affirmatively, the interviewer then asked the respondent what, if anything, she or he knew about the team.

Six of the fifty-nine New Jersey respondents who participated in the shirt survey recognized the Harlem Wizards' shirt as the new name of the Washington Bullets. Six or seven New Jersey respondents identified the shirt as belonging to the Harlem Wizards. Out of 100 Washington D.C. respondents to the shirt survey, fifty-nine identified the Harlem Wizards' shirt as the new name of the Washington Bullets. None of the Washington, D.C. respondents identified the shirt as belonging to the Harlem Wizards.

For the name survey, seventy-five respondents were interviewed in Northern New Jersey and seventy-five respondents were interviewed in the Washington, D.C. area. During each interview, an interviewer showed each respondent one of five cards marked with the following names printed in capital letters: Orlando Magic, Harlem Magic, Harlem Rockets, Harlem Wizards and Washington Wizards. The interviewer then asked the respondent whether he or she had heard of or ever seen this team and, if they had, what, if anything, did they know about it. If the respondent was unfamiliar with the team, the interviewer asked the respondent what he or she thought a team with such a name would be like. None of the respondents identified the cards marked Harlem Wizards.

In addition, Dr. Rappeport concluded, based on the survey results, that the service mark WIZARDS was not descriptive because the majority of people interviewed were unable to look at the mark and discern that it represented a basketball team. Dr. Rappeport also commented that defendants' survey also supported a finding that the service mark WIZARDS is not descriptive since so few people were able to associate WIZARDS with basketball.

Defendants commissioned their own survey by Dr. Jacob Jacoby to prove that no likelihood of confusion exists between the two teams and that none is likely in the future. Defendants' survey interviewed 365 respondents in sixteen cities across the country. All of the respondents were aged fourteen or older and had watched an NBA, college, high school or some other type of organized basketball game or exhibition during the last twelve months. Respondents were randomly separated into three groups and each group viewed nine t-shirts. Eight of the t-shirts were the same for each group. The only difference across the groups was that Group One saw a "Harlem Wizards" t-shirt, Group Two saw a "Wizards" t-shirt and Group Three saw a "Harlem" t-shirt. All respondents were then asked questions to determine to what extent, if any, they recognized these names. Those who recognized the names were asked follow-up questions to determine if they might be confused between the Harlem Wizards and the Washington Wizards.

Only three to five percent of all people questioned associated the mark WIZARDS with plaintiff. Survey results also established that less than two percent of the public were confused between the marks HARLEM WIZARDS and WASHINGTON WIZARDS and that less than three percent were con-

fused between the marks WIZARDS and WASHINGTON WIZARDS.

## DISCUSSION

### Standard for Injunctive Relief

The "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *FM 103.1, Inc. v. Universal Broadcasting of New York, Inc.*, 929 F.Supp. 187, 193 (D.N.J.1996) (quoting *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988)); *Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F.Supp. 893, 903 (D.N.J.1994) (same). The standard for granting a permanent injunction is nearly identical to that of a preliminary injunction except that the movant must show actual success on the merits rather than simply the likelihood of success on the merits. *Church & Dwight Co.*, 873 F.Supp at 903. In determining whether to grant a permanent injunction, a court must consider (1) whether the moving party has demonstrated success on the merits, (2) the probability of irreparable injury to the moving party, (3) the potential for harm to the non-moving party; and (4) the public interest if applicable. *See Church & Dwight Co.*, 873 F.Supp. at 903; *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1116 (3d Cir.1989).

### I

### Trademark Infringement

Plaintiff claims trademark infringement under Section 43(a) of the Lanham Act, The New Jersey Trademark Act (N.J.S.A. 56:4–1) and common law. N.J.S.A. 56:4–1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act and the analysis for trademark infringement under New Jersey common law is the same as under Section 43(a)(1). *See, e.g., FM 103.1, Inc. v. Universal Broadcasting of New York, Inc.*, 929 F.Supp. 187, 198 (D.N.J.1996). Thus, the Court's discussion with respect to plaintiff's Section 43(a) claim addresses its state law claims as well.

Plaintiff relies on the reverse confusion theory of trademark infringement first recognized by the Third Circuit Court of Appeals in *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 474–75, 31 U.S.P.Q.2d 1592, 1598 (3d Cir.1994). In an ordinary trademark infringement case, the alleged trademark infringer takes advantage of the reputation and good will of a senior trademark owner by adopting a similar or identical mark. *Id.* at 473–74, 31 U.S.P.Q.2d at 1597–1598. In contrast, reverse confusion arises when a larger, more powerful entity adopts the trademark of a smaller, less powerful trademark user and thereby causes confusion as to the origin of the senior trademark user's goods or services. *See, e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir.1992), *cert. denied*, 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993) (finding that Quaker Oats Co.'s use of "Thirst Aid" for its product Gatorade infringed on the registered "Thirst–Aid" trademark owned and formerly used by small Vermont beverage company); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486 (2d Cir.1988) (enjoining Bloomingdales Department stores from using mark "B–Wear" on clothing and in its stores because it infringed on the unregistered trademark "Bee–Wear" belonging to smaller women's clothing marketer). Because the junior user is a larger company with greater financial ability and trademark recognition in the marketplace, it can easily overwhelm the senior user by flooding the market with promotion of its similar trademark. *Fisons*, 30 F.3d at 474–75, 31 U.S.P.Q.2d at 1598. The strength of the junior user's promotional campaigns leads consumers to believe that the senior user's products derive from that of the junior user or that the senior user is actually the trademark infringer. *Id.* As a result, the senior user "loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.* (quoting *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987)). The federal courts and legal commentators have observed that failure to recognize reverse confusion would essentially immunize from unfair competition liability companies that have well established trade names and the financial ability to advertise a senior mark taken from smaller, less power-

ful competitors. *See id; Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1372 (10th Cir.1977).

■ The Lanham Act protects "an owner's interest in its trademark by keeping the public free from confusion as to the source of goods and ensuring fair competition," and extends to protect trademark owners against reverse confusion trademark infringement. *Fisons,* 30 F.3d at 474–75, 31 U.S.P.Q.2d at 1598 (internal quotations omitted). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides that:

> Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities—shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

■ Federal Courts have long recognized that Section 43(a)(1) "protects unregistered service marks in the same manner and to the same extent as registered marks" out of acknowledgement that trademark rights emanate from use and not only registration. *FM 103.1, Inc.,* 929 F.Supp. at 194. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615, *reh'g denied,* 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992); *accord Time Mechanisms, Inc. v. Qonaar Corp.,* 422 F.Supp. 905, 911 (D.N.J.1976). To prevail on a trademark infringement claim under Section 43(a) of the Lanham Act, a plaintiff must establish that: (1) the mark is valid and legally protectable; (2) the plaintiff owns the mark;

and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of such goods and services. *Fisons,* 30 F.3d at 472–73, 31 U.S.P.Q.2d at 1596. *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3d Cir.), *cert. denied sub nom., Altran Corp. v. Ford Motor Co.,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (citing *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990)).

A plaintiff demonstrates that a mark is valid and legally protectable when a mark is federally registered and "has become 'incontestible' under the Lanham Act." 15 U.S.C. §§ 1058 and 1065. *Fisons,* 30 F.3d at 472–73, 31 U.S.P.Q.2d at 1596. However, if the mark has not been federally registered, or if a registered mark has not achieved incontestability, then the mark is valid and legally protectable "if the public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.'" *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986) (quoting 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15.1 at 657 (2d ed. 1984)). Such identification first depends on whether a plaintiff can establish that an unregistered mark is inherently distinctive or has achieved secondary meaning—consumer recognition that the mark identifies the product as originating from a particular source. *See Fisons,* 30 F.3d at 472–73, 31 U.S.P.Q.2d at 1596; *Ford Motor Co.,* 930 F.2d at 291.

■ Trademark law evaluates marks along a continuum of distinctiveness, from the nondistinctive to the inherently distinctive: Marks are (1) generic, (2) descriptive, (3) suggestive or (4) arbitrary, or fanciful. A generic term functions as the common descriptive name of a class of products and are generally not legally protectable. *See, e.g., A.J. Canfield,* 808 F.2d at 292 ("chocolate fudge" is generic when used in connection with chocolate fudge flavored soda); *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, 29 U.S.P.Q.2d 296 (1938) ("shredded wheat" is generic term when used for a breakfast cereal). A descriptive mark immediately conveys a charac-

teristic, ingredient or quality of the article or service it identifies and acquires protected status only if the plaintiff can demonstrate that the goods or services have achieved secondary meaning. *See, e.g., Transfer Print Foils, Inc. v. Transfer Print America, Inc.*, 720 F.Supp. 425, 12 U.S.P.Q.2d 1753 (D.N.J.1989) ("Transfer Print" is descriptive for surface decorating machines, related technical machines, material and related technical services to distributors and manufacturers who require designs or words placed on their products). Suggestive, arbitrary and fanciful marks are afforded the highest level of trademark protection. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979). A suggestive mark requires the consumer to use imagination, thought, or perception to determine the character of the goods or service. *A.J. Canfield*, 808 F.2d at 297. *See, e.g., Taj Mahal Enterprises, Ltd. v. Trump*, 745 F.Supp. 240 (D.N.J.1990) ("Taj Mahal" suggestive of an Indian restaurant). An arbitrary mark employs terms that do not describe or suggest any attribute of goods or services sold and a fanciful mark uses unfamiliar language coined expressly for the purpose of trademark protection. *See Sunenblick v. Harrell*, 895 F.Supp. 616, 624 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684 (2d Cir.1996), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996).

■ As a threshold matter, this Court must determine whether the mark WIZARDS is inherently distinctive, that is, whether it can be defined as suggestive, arbitrary or fanciful. At the outset, the Court acknowledges that assessing a mark's distinctiveness is not an "exact science" and that the subtle distinctions between these categories can be slippery and elusive. *Banff Ltd*, 841 F.2d at 489. Nonetheless, a mark elicits a particular and quantifiable consumer reaction. Plaintiff asserts that the mark WIZARDS is an arbitrary or fanciful term and thus subject to the highest level of trademark protection. According to plaintiff, the term WIZARDS has no specific meaning when used in connection with basketball services, apparel, or related merchandise. In opposition, defendants advance several arguments. First, defendants argue that plain-

tiff's mark, to the extent that it has acquired one, consists only of the term HARLEM WIZARDS in its entirety. Defendants stress that the term "Harlem" is an essential element of plaintiff's mark and identity as a show basketball team. In support of this argument, they note that several show basketball teams have sought to capitalize on the genre established by the Harlem Globetrotters by adopting "Harlem" as part of their appellation. Defendants also argue that plaintiff, since its inception, has only sporadically used the term WIZARDS alone as a mark and then only in contexts where the consumer already knows that such materials pertain to the Harlem Wizards. Second, defendants claim that the mark WIZARDS is not inherently distinctive because it describes the nature of plaintiff's services, the "trickery," "wizardry" and "magic" of its basketball performances. As a descriptive mark, plaintiff would have to demonstrate that it has achieved secondary meaning, an unlikely proposition because its consumer recognition level is virtually nonexistent as evidenced by the survey results presented by both parties.

This Court finds that although plaintiff has used the mark HARLEM WIZARDS more consistently than the mark WIZARDS over the years, its use of the mark WIZARDS has nevertheless been sufficient to establish trademark rights. The Court, however, finds that plaintiff's mark is suggestive rather than, as plaintiff asserts, arbitrary or fanciful. The term WIZARDS does not describe accurately plaintiff's services because regardless how talented plaintiff's team members may be, they do not perform magic or even magically. Rather, the mark WIZARDS is accurately defined as suggestive because it asks the consumer to fantasize, to use his or her imagination to connect the idea of magic and the supernatural with show basketball. Because the Court finds that the mark WIZARDS is inherently distinctive, it now turns to the question of whether a likelihood of confusion exists between both parties' use of the mark.

**II**

■ Plaintiff bears the burden of establishing that defendants' concurrent use of the

mark WIZARDS will create a likelihood of confusion among basketball fans between the Harlem Wizards and the Washington Wizards. The showing of proof necessary for a plaintiff to prevail depends upon whether the goods or services offered by the trademark owner and alleged infringer are competitive or noncompetitive. *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472–73, 31 U.S.P.Q.2d 1592, 1596 (3d Cir. 1994). If the action involves competing goods, "the court need rarely look beyond the mark itself." *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983). In such cases, the court simply analyzes whether the similarity of the marks engenders confusion. *Fisons,* 30 F.3d at 472–73, 31 U.S.P.Q.2d at 1596; *Country Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1063 (3d Cir.1991). In actions where the goods are non-competing, "the similarity of the marks is only one of a number of factors the court must examine to determine the likelihood of confusion." *Fisons,* 30 F.3d at 473, 31 U.S.P.Q.2d at 1596. If the goods or services are noncompeting,

> the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold. The closer the relationship between the products, and the more similar their sale contexts, the greater the likelihood of confusion. Once a trademark owner demonstrates the likelihood of confusion, it is entitled to injunctive relief.

*Id.* (quoting *Lapp,* 721 F.2d at 462 (citations omitted)).

Likelihood of confusion exists if the consuming public assumes upon viewing a mark that the products or service represented by the mark is associated with a different product or service represented by a similar mark. *See* 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 2301[1] (1992). To measure the likelihood of confusion in a reverse confusion case, a court applies the same test developed to assess the likelihood of confusion in direct confusion cases. The Court of Appeals for the Third Circuit has identified ten factors to be considered in determining whether a likelihood of confusion exists in the marketplace

regarding the source of a product or service. *Fisons,* 30 F.3d at 473–74, 31 U.S.P.Q.2d at 1597; *Dranoff–Perlstein Assoc. v. Sklar,* 967 F.2d 852, 862–863 (3d Cir.1992); *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 293 (3d Cir.), *cert. denied sub nom., Altran Corp. v. Ford Motor Co.,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Lapp,* 721 F.2d at 463; *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978). These factors are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of owner's mark;

(3) the price of the goods and others factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods [or services], though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties sales efforts are the same;

(9) the relationship of the goods [or services] in the minds of consumers because of similarity of function; and

(10) other facts suggesting that the consuming public might expect the defendant's market, or that he is likely to expand into that market.

*Lapp,* 721 F.2d at 463 (citing *Scott Paper Co.,* 589 F.2d at 1229). In determining whether a likelihood of confusion exists, courts must weigh each factor separately. *Fisons,* 30 F.3d at 481–82, 31 U.S.P.Q.2d at 1604.

### 1. *Similarity of Services*

The Court first addresses whether the services offered by the parties are similar because in its view, this factor is the most dispositive regarding the existence of any likelihood of confusion. Courts have held that where the goods and services offered by

the plaintiff and defendant are dissimilar or non-competitive, consumer confusion is less likely to occur. *See, e.g., Taj Mahal,* 745 F.Supp. at 250; *Sunenblick,* 895 F.Supp. at 629. In *Taj Mahal,* the court held that the differences in services offered by plaintiff, a restaurant serving Indian cuisine, and those of defendant, a hotel and casino, were sufficiently different as to contribute significantly to a finding that no trademark infringement had occurred or would occur. *Id.* at 250. Notably, the Ninth Circuit recently held that where "a court determines as a matter of law from the pleadings that the goods [or services] are unrelated and confusion is unlikely, the complaint should be dismissed." *Murray v. Cable Nat'l Broadcasting Co.,* 86 F.3d 858, 860 (9th Cir.1996), *cert. denied sub nom, Robert Murray d/b/a American Speaks v. Cable National Broadcasting d/b/a America's Talking,* —— U.S. ——, 117 S.Ct. 689, 136 L.Ed.2d 613 (1997).

█ This case presents dissimilarity between services comparable to those presented in *Taj Mahal.* Plaintiff would have this Court simply lump the services of plaintiff and defendants under the heading of basketball or entertainment and, on that basis alone, find that the parties engage in confusingly similar services. Numerous cases, however, illustrate that even when two products or services fall within the same general field, it does not mean that the two products or services are sufficiently similar to create a likelihood of confusion. Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category. For example, in *Sunenblick,* the court found no reverse confusion between jazz records and hip-hop records sold under the identical mark UPTOWN RECORDS because although the recordings were both musical products, they were marketed to different consumers and sold in separate sections of record stores. *Id.* at 629. In *Swanson v. Georgetown Collection, Inc.,* No. 94–CV–1283, 1995 WL 72717 (N.D.N.Y. Feb. 14, 1995), the court held that reverse confusion was unlikely between the mark FARAWAY FRIENDS for porcelain dolls and FAR AWAY FRIENDS for cloth dolls. *Id.* at *12.

Similarly, in *W.W.W. Pharmaceutical Co., Inc., v. Gillette Co.,* 984 F.2d 567 (2d Cir. 1993), another reverse confusion case, the mark RIGHT GUARD, SPORT STICK for a deodorant was found not to be in competitive proximity with the mark SPORTSTICK used for a lip balm, even though "both [may be] generally defined as personal care products." *Id.* at 573–74. In *Lang v. Retirement Living Publishing Co. Inc.,* 949 F.2d 576 (2d Cir. 1991), the court held that defendant's use of NEW CHOICES FOR THE BEST YEARS for a magazine and plaintiff's use of NEW CHOICES PRESS for a publishing house was not likely to cause reverse confusion. *Id.* at 582–83.

The show basketball performed by plaintiff is markedly distinct from NBA competitive basketball in myriad ways. As a show basketball team, plaintiff simply does not play NBA level competitive basketball. Even accepting plaintiff's contention that it has on many occasions played genuinely competitive basketball during the first and third quarters of its games, it is undisputed that the remaining quarters are reserved for comedy routines and fancy tricks. It is inconceivable that the NBA would adopt such a "show" format. Plaintiff also plays against any team put together by the organization that purchases its services. Consequently, its competition is ordinary citizens and not serious NBA level athletes. Furthermore, as a show basketball team, plaintiff does not play in a league, whereas in the NBA, league competition is an intrinsic element of the sport. Also in contrast to the NBA, a large proportion of plaintiff's performances are non-game appearances such as school assembly programs. And with respect to plaintiff, there is no proof that the athletic quality of its average player is similar to that of an NBA team member. These are but a few examples of the dissimilarity between the parties' services. Therefore, the court finds that when every aspect of the two teams is compared, there is glaring dissimilarity. Any similarity between the two teams is superficial and the result of creating overinclusive categories that are irrelevant to the likelihood of confusion.

### 2. Channels of Trade and Target Audience

The similarities between the channels of trade and target audiences of the two teams are closely related and therefore, the Court considers these two factors together. The channels of trade that plaintiff uses are not similar to those used by defendants. Plaintiff established that it targets event organizers at high schools, colleges, and charitable organizations and advertises through direct mail solicitation, participation at trade shows, and trade magazines. Plaintiff does not advertise on television, radio or in the popular print media. Plaintiff's merchandise is only available as souvenirs at its games and appearances. In contrast, the Washington Bullets, as a NBA member team, advertises its services directly to sports fans through television and print media and its merchandise is widely available in retail stores. Moreover, as a show basketball team, plaintiff competes with other show and comedy basketball teams for customers and not with the NBA. For example, plaintiff frequently refers to the Harlem Globetrotters in its advertisements and promotional material because it is seeking to reach that more famous team's audience. Therefore, the Court finds that plaintiff has failed to establish that it shares the same channels of trade and target audience as defendants.

### 3. Similarities Between the Marks

In considering the similarity between two marks, the court "must compare the appearance, sound and meaning of the marks, as well as the manner in which they are used." *Taj Mahal,* 745 F.Supp. at 247 (citing *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 824 (D.N.J.1980)). When "making such a comparison, the relevant factor is 'the overall impression created by the mark as a whole rather than simply comparing the individual features of the marks.'" *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 975 (11th Cir. 1983)). Marks "are confusingly similar if ordinary consumers would likely conclude that ... [the products or services] share a common source, affiliation, connection or sponsorship." *Fisons,* 30 F.3d at 477, 31

U.S.P.Q.2d at 1600. In trademark actions that involve picture or design marks, similarity of appearance is controlling. 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23.07. However, "[s]imilarity is not limited to the eye or ear. The mental impact of a similarity of meaning may be so pervasive as to outweigh any visual or phonetic differences." *Id.* at § 23.08. If two marks create essentially the same overall impression, it is highly probable that the two marks are confusingly similar. *See id* at 477–79, 31 U.S.P.Q.2d at 1601; *Ford Motor Co.,* 930 F.2d at 293; *Opticians Ass'n of America,* 920 F.2d at 195. Nevertheless, "[s]imilarity of the marks is merely one of the relevant factors, and it is not dispositive on the issue of likelihood of confusion." *Taj Mahal,* 745 F.Supp. at 247.

The Court finds that the evidence presented establishes that plaintiff uses the mark HARLEM WIZARDS with great frequency and uses the mark WIZARDS with sufficient regularity on its uniforms and merchandise. Defendants have used and plan to continue using the marks WASHINGTON WIZARDS and WIZARDS. The Court finds that when compared in their entirety, the marks HARLEM WIZARDS and WASHINGTON WIZARDS are similar and use by the parties of the mark WIZARDS alone is obviously identical.

The use of a design as part of a mark minimizes any likelihood of confusion. 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23.15[5]. Because defendants have not yet selected a logo, it is impossible to consider the similarities in logo design and merchandise. Nonetheless, the Court notes that the Washington Bullets' logo when selected will presumably have a unique logo and color scheme and will contain the NBA's distinctive tagging and logo of a ball-dribbling player. In contrast, plaintiff lacks a consistent logo and distinctive colors. Therefore, it is highly unlikely that merchandise offered by the parties will result in the likelihood of confusion among consumers. The Court also concludes that the linguistic similarity between the contested marks will not result in the likelihood of confusion because the services offered are

markedly dissimilar and the parties do not target the same audience.

### 4. Strength of Plaintiff's Mark

Traditionally, "the term strength as it applies to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although a possible anonymous source." *Taj Mahal*, 745 F.Supp. at 248. The degree of distinctiveness attributed to a mark is, in part, determined by its placement on the continuum of distinctiveness discussed in Part II. *See Sunenblick*, 895 F.Supp. at 626; *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983). Classification of a mark as suggestive, however, "is not necessarily dispositive on the issue of its strength, which must finally be determined in reference to its commercial context." *Sunenblick*, 895 F.Supp. at 626. It is possible that a mark "may be conceptually strong and yet commercially weak if it lacks the requisite 'origin-indicating' quality in the eyes of the consumer." *Id.*

In *Fisons*, the Third Circuit observed that "in a case of reverse confusion, the evidence of commercial strength is different from what we expect in a case of forward confusion." *Id.* at 479, 31 U.S.P.Q.2d at 1602. It noted that "an aggressive junior user may thereby achieve greater commercial strength in a short period of time than the senior user has after years of marketing its product" because "the junior user is typically a wealthier, more powerful company [that] can overwhelm the market with advertising." *Id.* The Third Circuit in *Fisons* criticized the district court's heavy emphasis on the plaintiff's failure to demonstrate that it had developed consumer awareness of its mark and its product through substantial investment and failure to consider the distinctiveness of plaintiff's mark. *Id.* Nonetheless, while the Third Circuit ruled that a mark's inherent distinctiveness is of great importance, it also recognized that commercial strength remains a factor that must be considered. *Id.*

This Court has already determined that the mark WIZARDS is suggestive and therefore, inherently distinctive. Nonetheless, this categorization of plaintiff's mark does not in and of itself establish that plaintiff's mark is strong and that the likelihood of confusion exists. Although plaintiff's mark is distinctive, it is undeniably commercially weak. Plaintiff's own survey results reveal the weakness of its mark: in Northern New Jersey, plaintiff's strongest market, only six out of fifty-nine people associated the mark WIZARDS with plaintiff. In defendants' survey, only four percent of people across the nation associated the mark with plaintiff. This weakness is of course understandable because plaintiff admittedly does not advertise its mark directly to consumers. In evaluating this likelihood-of-confusion factor, the Court does not hold plaintiff to the same standard as defendants who have the financial ability to expend large sums of money on promotion and advertising. Nonetheless, the Court finds that the inherent distinctiveness of plaintiff's mark does not override its marked commercial weakness, even when this factor is weighed more heavily. Because the mark is weak it fails to identify plaintiff's services with a particular source. Therefore, the Court finds that this factor favors the defendants.

### 5. Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase

It is widely accepted as true that consumers are less likely to be confused about the origin of specific goods or services if such goods are expensive because the amount of care and attention expended by consumers increases proportionately as the price of the desired goods or services increases. *Taj Mahal*, 745 F.Supp. at 248–249; *Restaurant Lutece, Inc. v. Houbigant, Inc.*, 593 F.Supp. 588, 595 (D.N.J.1984). Plaintiff's goods and services include games, appearances and merchandise. Harlem Wizards' tickets typically sell for between five and eight dollars while NBA tickets are significantly more expensive, requiring somewhat of an inheritance as a paying source. It is not surprising therefore, that the average NBA fan earns about $60,000 a year. Given the disparity between ticket prices of the plaintiff and the NBA alone, it is unlikely that likeli-

hood of confusion exists between the parties' services. Moreover, NBA fans are generally sophisticated and knowledgeable of their sport; they read about their favorite teams in the sports pages or listen to sports reporting and commentary on television and radio. Therefore, the Court finds it unlikely that consumers will attend a Harlem Wizards' game expecting to see NBA basketball or purchase NBA tickets expecting to see the Harlem Wizards perform show basketball.

In addition, likelihood of confusion is also unlikely to occur with regard to the range of merchandise sold by both parties. Although the Court did not hear testimony establishing the pricing of merchandise marketed by both parties, the Court notes that much of it is probably similar in price and quality. However, because the parties sell their merchandise in completely different channels of trade—the NBA sells its merchandise at retail outlets and games and plaintiff sells its merchandise only at its games and appearances—it is unlikely that likelihood of confusion will occur between parties' merchandise regardless of similarities in price.

### 6. *Evidence of Actual Confusion*

It is well established that in a trademark infringement action, a plaintiff need not present evidence of actual confusion and need only show that a likelihood of confusion exists. *Ford Motor Co.,* 930 F.2d at 292. However, "evidence of actual confusion, where shown, is highly probative of the likelihood of confusion." *Sunenblick,* 895 F.Supp. at 629. As evidence of actual confusion, plaintiff relies on individual testimony regarding actual incidents of confusion between the marks, consumer survey results and expert testimony. First, plaintiff offered testimony by current Harlem Wizards' players who recounted incidents when they wore Harlem Wizards' shirts or jackets and strangers misidentified the garments as belonging to the Washington Wizards or asked the players if they played for the Washington Wizards. The Court finds that these examples are too weak and few to establish actual confusion. Actual confusion is not the same as clear mistake or misidentification on the part of consumers, many of whom it turns

out were children. Moreover, there is no evidence that these purported instances of actual confusion could have any effect on consumer purchasing decisions.

Survey evidence can sometimes demonstrate evidence of actual confusion but only to the extent "that the survey mirrors the real world setting which can create an instance of actual confusion." 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23.01[3][a]. A party introducing a consumer survey bears the burden of establishing that it was conducted in accordance with accepted principles of survey research, i.e., that (1) a proper universe was examined; (2) a representative sample was drawn from that universe; (3) the mode of questioning the interviewees was correct; (4) the persons conducting the survey were recognized experts; (5) the data gathered was accurately reported; and (6) the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of procedure and statistics. *National Football League Properties, Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 513–514 (D.N.J.1986).

This Court is wary to draw conclusions from the survey results introduced by both parties, because of the small samples used. Nonetheless, the survey results introduced by both parties clearly demonstrate that consumer recognition of plaintiff is almost nonexistent. Consequently, the Court finds that plaintiff has failed to prove the occurrence of actual confusion.

### 7. *Defendants' Intent in Adopting the Mark*

Ordinarily, the relevant intent inquiry in a trademark infringement case involves determining "whether the defendant adopted a mark with the intent of promoting confusion and appropriating the prior user's good will." *Fisons,* 30 F.3d at 479, 31 U.S.P.Q.2d at 1602 (internal quotations omitted). In *Fisons,* the Court of Appeals held that although this relevant intent inquiry is both important and appropriate in traditional cases of direct confusion, such an inquiry serves no purpose in a reverse confusion case. *Id.* In reverse confusion cases, the junior user simply does

not attempt to take advantage of the senior user's good will and reputation; instead the junior user seeks to overwhelm it. *Id.* The Court of Appeals then identified as a more appropriate inquiry whether the defendant was careless in conducting its trademark name search and in considering the likelihood of confusion with other companies that used similar marks. *Id.*

Defendants produced testimony and exhibits indicating that they had arranged for trademark searches to be done before and during the name-change contest. It appears that defendants did not engage in additional investigation after it learned that plaintiff used the federally unregistered mark HARLEM WIZARDS and provided sports entertainment services. Nonetheless, there is no evidence that defendants adopted the mark WIZARDS in bad faith. None of the employees involved in narrowing the names to a final selection of five names had previously heard of plaintiff. Although two Washington Bullets employees were familiar with plaintiff before the "name contest", neither of them was involved in the preparation, promotion or name selection before or during the event. Moreover, defendants had sought the advice of counsel before adopting the new name. Therefore, the Court finds that there is no proof that defendants were careless in the selection of WIZARDS as the new mark for the Washington Bullets and in considering the likelihood of confusion with similar marks of other companies.

### 8. *Likelihood of Expansion*

Whether there is a likelihood that plaintiff will expand into a market where a defendant already actively participates is a crucial factor in cases involving non-competitive goods and services because one of the "chief reasons for granting a trademark owner protection in a market not his own is to protect his right someday to enter that market." *Lapp*, 721 F.2d at 464 (citation omitted). Therefore, when it appears likely that a trademark owner will soon enter the defendant's field, this factor weighs in favor of injunctive relief. *Fisons*, 30 F.3d at 473–74, 31 U.S.P.Q.2d at 1597. It is very unlikely that the Harlem Wizards will expand its services to include purely competitive basketball. Plaintiff has offered no evidence that it entertains any expansion plans to begin playing NBA-level basketball. Rather, the expansion plans alluded to in its five-year business plans center around emerging as the second greatest show basketball team in the country. Hence, because there is no likelihood that plaintiff plans to play professional competitive basketball, this factor weighs against injunctive relief.

### 9. *Other Factors that Suggest that the Public Would Expect the Plaintiff Offer a Similar Service.*

Based on the evidence presented, the Court finds that there are no other factors that would lead consumers to believe that plaintiff offers services similar to the NBA. For nearly thirty-five years, plaintiff has limited its services to show basketball, a service that is separate and distinct from NBA basketball. Plaintiff has not shown that it plans to chart a new course by entering the world of professional competitive basketball. The evidence presented inevitably leads to the conclusion that under these circumstances, a wizard is not a wizard. Therefore, for the reasons stated, the Court finds that the Washington Bullets' adoption of the Washington Wizards as its new name poses no likelihood of injury to the Harlem Wizards in the marketplace and dismisses plaintiff's federal and state law claims.

### CONCLUSION

For the reasons stated in this Court's Opinion; It is on this 27th day of January 1997; ORDERED that the complaint is hereby dismissed.